# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BULLSEYE GLASS CO.**, | Case No. 3:17-cv-1970-JR |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **GOVERNOR KATE BROWN**, *et al.*, | |
| Defendants. | |

Allan M. Garten, Kent S. Robinson, and Carrie Menikoff, GRM LAW GROUP, 5285 Meadows Road, Suite 330, Lake Oswego, OR 97035. Of Attorneys for Plaintiff.

Ellen F. Rosenblum, Oregon Attorney General, Scott J. Kaplan and Carla Scott, Senior Assistant Attorneys General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Of Attorneys for Defendants Kate Brown, Richard Whitman, and Patrick Allen.

Jenny M. Madkour, Multnomah County Attorney, and James G. Rice and Jacqueline Sadker Kamins, Senior Assistant County Attorneys, Office of the Multnomah County Attorney, 501 SE Hawthorne Boulevard, Suite 500, Portland, OR 97214. Of Attorneys for Defendant Multnomah County Health Department.

**Michael H. Simon, District Judge.**

Plaintiff Bullseye Glass Co. ("Bullseye") brings this lawsuit against Defendants

Governor Kate Brown ("Brown"), Director of the Oregon Department of Environmental Quality

("DEQ") Richard Whitman ("Whitman"), Director of the Oregon Health Authority ("OHA")

Patrick Allen ("Allen"),[1] and the Multnomah County Health Department ("Multnomah County"). Bullseye asserts two claims. As Claim One, Bullseye alleges that all Defendants have denied Bullseye "substantive due process" in violation of 42 U.S.C. § 1983.[2] As a remedy for Claim One, Bullseye seeks declaratory and injunctive relief against all Defendants and money damages only against Multnomah County.

As Claim Two, Bullseye seeks only declaratory and injunctive relief against the State Defendants. Specifically, Bullseye seeks a declaration that a specific federal air quality regulation, 40 C.F.R. Part 63, Subpart SSSSSS, § 63.11448, ("Regulation 6S"), does not apply to Bullseye or its operations. Under the Clean Air Act, the United States Environmental Protection Agency ("EPA") is responsible for regulating emissions of hazardous air pollutants. Pursuant to that authority, EPA has issued National Emission Standards for Hazardous Air Pollutants ("NESHAPS"), including Regulation 6S. As a further remedy for Claim Two, Bullseye requests injunctive relief, enjoining the State Defendants from enforcing either Regulation 6S—or its state equivalent—against Bullseye.

All Defendants have moved to dismiss Bullseye's first claim. The State Defendants also have moved to dismiss Bullseye's second claim. In his Findings and Recommendation ("F&R"), United States Magistrate Judge Paul Papak recommended dismissing both claims with prejudice.[3] For the reasons that follow, the Court adopts the F&R in part and declines to adopt it

---

[1] The Court refers to Defendants Brown, Whitman, and Allen collectively as the "State Defendants."

[2] Bullseye does not allege that Defendants violated Bullseye's right to "procedural due process." Also, Bullseye originally alleged in Claim One a violation of both 42 U.S.C. § 1983 and 42 U.S.C. § 1985. Bullseye has since conceded its claim under § 1985.

[3] After Judge Papak issued his F&R, he retired from active service as a United States Magistrate Judge. This case was then reassigned to United States Magistrate Judge Jolie A. Russo.

in part. Because Bullseye has not stated a claim under § 1983, the Court grants Defendants'

motion to dismiss Plaintiff's first claim without prejudice. Regarding Plaintiff's second claim,

because the Court has subject matter jurisdiction to address that claim and neither Eleventh

Amendment immunity nor the doctrine of claim preclusion bars that claim, the Court denies the

State Defendants' motion to dismiss Plaintiff's second claim.

## STANDARDS

### A.  Magistrate Judge's Findings and Recommendation

Under the Federal Magistrates Act, a court may "accept, reject, or modify, in whole or in

part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party

files an objection to a magistrate judge's findings and recommendations, "the court shall make a

*de novo* determination of those portions of the report or specified proposed findings or

recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3). Plaintiff and the

State Defendants have objected to portions of the F&R, and the Court has reviewed those

portions *de novo*.

### B.  Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction. *Gunn v. Minton*, 568 U.S. 251, 256

(2013). A federal court must presume "that a cause lies outside this limited jurisdiction, and the

burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v.

Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted); *see also Robinson v.

United States*, 586 F.3d 683, 685 (9th Cir. 2009); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035,

1039 (9th Cir. 2004). A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil

Procedure for lack of subject matter jurisdiction, because it involves a court's power to hear a

case, "can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). The

Court must dismiss any case over which it lacks subject matter jurisdiction. Fed. R. Civ.

P. 12(h)(3). A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be either "facial" or "factual." *See Safe Air for Everyone*, 373 F.3d at 1039. A facial attack on subject matter jurisdiction is based on the assertion that the allegations contained in the complaint are insufficient to invoke federal jurisdiction. *Id.*

## C. Failure to State a Claim

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The Court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain factual allegations sufficient to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a

probability requirement, but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation

marks omitted).

## BACKGROUND[4]

Bullseye is an Oregon corporation that manufacturers colored glass for use in both art and

architecture. Both its headquarters and its manufacturing facility are in Portland, Oregon. In 2015

and early 2016, the DEQ concluded that airborne emissions from Bullseye's glass-making

operations might contain pollutants presenting serious public health concerns. This discovery

originated in part from a study that DEQ conducted with the United States Forest Service

beginning in 2013. The study investigated the presence of heavy metals in moss found on trees in

Portland ("Moss Study"). The final Forest Service report on the Moss Study was released on

June 9, 2016. The report indicated that the sample with the highest readings for cadmium and

arsenic was located only several blocks north of Bullseye's colored glass manufacturing facility.

Based on the preliminary results of the Moss Study and before the release of the final

Forest Service report, a DEQ official contacted Bullseye. The official explained that DEQ would

be conducting emissions testing by placing an air quality monitor close to Bullseye's facility.

DEQ then measured the air quality during 18 days of testing in October and early

November 2015. On January 19, 2016, DEQ received the test results. The results showed

maximum daily concentrations of arsenic and cadmium above typical urban concentrations, as

defined by the federal Agency for Toxic Substances and Disease Registry, which is part of the

---

[4] The recited background is drawn largely, but not exclusively, from Bullseye's
Complaint and the documents received by judicial notice without objection.

United States Department of Health and Human Services. Neither DEQ nor the Forest Service informed Bullseye of these results at the time they were received.

During the same period when DEQ was monitoring the air quality near Bullseye's facility, the Forest Service collected soil samples from directly below the moss-bearing trees. The results of this soil sampling indicated that the average arsenic and cadmium levels in the soil around Bullseye were below "background levels." The background level of a metal is the concentration at which it is expected to occur in an area due to natural sources and general urban contamination.

On approximately February 1, 2016, the results from DEQ's air quality testing were disclosed to the news media. The results of the soil sampling, however, were not publicly disclosed. On that same day, February 1, 2016, DEQ officials visited the Bullseye facility, provided Bullseye with a copy of the air quality test results, and informed Bullseye that these results had been given to the press. The resulting news accounts included substantial criticism of Bullseye.

On February 9, 2016, the Multnomah County Health Department released a map, purporting to show estimated cadmium air concentrations in Portland. This map was published in local newspapers and appeared on local television news programs. Bullseye alleges that Defendants "knew or should have known that map was false, because there was no scientific basis for predicting air quality based on metal in moss." Bullseye bases this assertion on a scientific article published six weeks later by two Forest Service employees, which acknowledged an absence of sufficient data "to convert moss-based maps into atmospheric concentration values."

On February 12, 2016, Bullseye met with representatives of DEQ and the Oregon Department of Justice. Bullseye agreed that it would install a pollution control device as soon as possible. According to Bullseye, at that meeting DEQ "conceded" that DEQ's October 2015 air quality testing did not provide sufficient data to evaluate air quality because it measured data for only 18 days. Bullseye and DEQ continued to negotiate an emissions agreement. By March 3, 2016, Bullseye alleges, it believed that it had reached an agreement with DEQ, but DEQ allegedly told Bullseye that the "optics weren't right" to enter into an agreement at that time. On March 8, 2016, DEQ wrote a letter to Bullseye, stating that DEQ would be asking the Oregon Environmental Quality Commission to draft temporary rules applicable to glass manufacturers.

The following day, March 9, 2016, DEQ wrote a letter to the EPA, asking that agency to reevaluate its interpretation of Regulation 6S. EPA's Regulation 6S is intended to control metal emissions from glass manufacturing facilities. Before the DEQ sent its letter to the EPA, both DEQ and EPA had interpreted Regulation 6S as not applying to Bullseye and other smaller glass manufacturers. On April 12, 2016, the EPA issued a "non-binding regulatory interpretation," concluding that DEQ had discretion to determine that Regulation 6S was applicable to Bullseye.

On April 13, 2016, DEQ wrote to Bullseye, advising that DEQ had determined that Regulation 6S was applicable to Bullseye, and DEQ requested that Bullseye provide DEQ with the information necessary to ensure compliance with Regulation 6S. On April 25, 2016, DEQ sent Bullseye a "Pre-Enforcement Notice," stating that "[b]ecause your facility is subject to [Regulation] 6S, your facility was required to apply for a Title V permit." Under Title V of the federal Clean Air Act, the process relating to Title V air permits may be administered by a state acting pursuant to state regulations. In Oregon, Title V air permits are administered by DEQ. As DEQ stated in its Pre-Enforcement Notice, Bullseye was in violation of Oregon air quality

regulations. DEQ proposed that Bullseye and DEQ enter into an agreement that would resolve the violation.

On May 19, 2016, DEQ and the OHA asked Oregon's Governor to authorize an order pursuant to Or. Rev. Stat. ("ORS") § 468.115, requiring Bullseye to cease and desist from using certain metals in an uncontrolled furnace for ten days (the "C&DO"). The Governor agreed, and the CD&O was issued. Bullseye did not seek administrative or judicial review of the C&DO, which it could have done under the Oregon Administrative Procedures Act. Eight days later, on May 27, 2016, because Bullseye still had not entered into an agreement with DEQ to cease uncontrolled emissions of hazardous metals, the Governor directed DEQ to renew the C&DO. Bullseye also did not seek administrative or judicial review of the renewed order.

On June 6, 2016, Bullseye and the DEQ entered into a Mutual Agreement and Final Order ("MAO"). ECF 8-1. The MAO recites, among other things:

> 3. DEQ and Bullseye each seek regulatory and operational clarity, compliance with law, and certainty with respect to the operations of Bullseye's glass manufacture operations in Portland, Oregon. It is in the best interests of both DEQ and Bullseye to enter into this Mutual Agreement and Final Order (MAO) to further those common goals.
>
> \* \* \*
>
> 10. On April 12, 2016, EPA sent DEQ a letter clarifying that, for the glass manufacturing NESHAP, the term "continuous furnace" means furnaces that are continuously heated, as are the furnaces at Bullseye's glass manufacturing facility. EPA's letter stated that its clarification was non-binding and left applicability determinations for DEQ to make. DEQ has determined that it will apply EPA's clarification for the purposes of implementing Regulation 6S. Bullseye disagrees with EPA's clarification and asserts that it is not consistent with the applicable definition of continuous furnaces.
>
> 11. Based upon EPA's April 12, 2016 letter, DEQ has determined that Bullseye's glass manufacturing facility is subject

to 6S because it meets all of the criteria in paragraph 9, above. Bullseye denies that it was and is subject to Regulation 6S.

12.     Regulation 6S requires that the emissions from any continuous furnace that makes glass at a rate of at least 50 tons per year or more that contains metal HAPs must be tested, meet emissions standards and be monitored, among other requirements. 40 CFR § 63.11449 through 63.11457. Regulation 6S also requires that any facility subject to 6S must obtain a Title V permit. 40 CFR § 63.11449(e).

13.     Prior to the April 12, 2016 letter from EPA, DEQ had considered Bullseye's glass manufacturing facility to be exempt from 6S.

14.     Based upon EPA's April 12, 2016 letter and other information that Bullseye has provided to DEQ, DEQ has concluded that Bullseye is now subject to 6S and will be operating in violation of 6S and OAR 340-244-0220(1) until Bullseye fully complies with the compliance schedule in paragraph 26 of this MAO and is issued an Oregon Title V Operating Permit in accordance with paragraph 26. Bullseye disagrees with DEQ's conclusion that it is and will be operating in violation of Regulation 6S and OAR 340-244-0220(1).

15.     DEQ and Bullseye recognize that the Environmental Quality Commission has the power to impose civil penalties and to issue an abatement order for violations of Oregon environmental law. Bullseye does not agree with DEQ's conclusion that Bullseye has violated 6S and Bullseye makes no admission of any such violation. With these caveats, Bullseye nevertheless voluntarily agrees to enter into this MAO in settlement of any past or future violations referred to in paragraphs 8 through 14 above. Therefore, pursuant to ORS 83.417(3)(a) and (b), DEQ and Bullseye agree to settle the violations that may have occurred prior to the date of this agreement, and to limit and resolve future violations referred to in paragraph 14 above, in advance, by this MAO.

*     *     *

17.     This MAO is not intended to limit, in any way, DEQ's right to proceed against Bullseye in any forum in the event that there are future violations. DEQ and Bullseye agree that this MAO settles all past claimed violations described in paragraphs 8 through 14, above.

*Id.* The MAO then provides for a number of actions that must be taken by Bullseye and further provides that it is a Final Order entered by the DEQ. *Id*. Bullseye voluntarily agreed to the MAO and did not seek judicial review of that order.

On December 12, 2017, Bullseye commenced this lawsuit. ECF 1. In its papers filed in connection with the pending motions and objections, Bullseye represents that on May 30, 2017, it filed its Title V permit and has fully complied with all obligations required under the MAO. ECF 46, at 6.

## DISCUSSION

### A. Substantive Due Process

In Claim One, Bullseye alleges a violation of its right to *substantive* due process under the Fourteenth Amendment to the United States Constitution. The Supreme Court has described the guarantee of substantive due process as the protection of the individual against arbitrary action by the government. *Wolf v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government[.]"). In the context of challenges to executive actions involving a "non-fundamental right," which Bullseye concedes is the situation in this case, the Supreme Court has generally required proof of governmental conduct that "shocks the conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).

In their motion to dismiss Claim One, Defendants argue that Bullseye fails sufficiently to allege a constitutionally-protected property interest or that Defendants caused any deprivation of any such interest. Defendants also argue that Bullseye fails plausibly to allege conduct that "shocks the conscience." The Court will assume without deciding that Bullseye sufficiently alleges a constitutionally-protected property interest in its business "goodwill." The Court also will assume without deciding that Bullseye sufficiently alleges that Defendants' conduct caused

injury to Bullseye's goodwill. The Court, however, holds that Bullseye has not sufficiently alleged conduct that "shocks the conscience."[5]

In its Complaint, Bullseye asserts numerous allegations about Defendants. In many of these, however, Bullseye blurs the distinction between well-pleaded facts, which the Court must credit as true at this stage of the lawsuit, and legal conclusions couched as factual allegations, which the Court need not credit as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). For example, in ¶ 18 of the Complaint, Bullseye alleges that Multnomah County "disseminated false and misleading maps purporting to show results of the moss study in an effort to falsely paint Bullseye as the epicenter of industrial pollution in Portland" as proof of conduct involving deliberate and knowing falsehoods. Although the Court must, at this stage, assume the truth of all well-pleaded factual allegations (*e.g.*, that the maps did not accurately portray air quality levels), Bullseye offers no specific allegations of fact that plausibly support its characterization of intentional, deliberate, or knowing falsehoods on the part of Defendants, nor any intentional effort falsely to paint Bullseye as the epicenter of industrial air pollution in Portland. Bullseye only offers legal conclusions couched as factual allegations, which the Court does not credit as true. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.").

Nor is the Court persuaded by Bullseye's argument that, for the allegations that are properly factual rather than merely legal conclusions, Ninth Circuit precedent compels the

---

[5] Defendant Multnomah County also argues that Bullseye has failed to state a municipal liability claim for money damages against Multnomah County under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690, (1978). Although there may be merit to that argument, the Court similarly declines to resolve that question at this time based on its conclusion that Bullseye has not sufficiently alleged conduct that shocks the conscience.

conclusion that "allegations identical to those Bullseye has raised" must be found to "shock the conscience." Among other things, the Court notes that the Ninth Circuit cases cited by Bullseye are factually distinguishable. Bullseye classifies the Ninth Circuit precedent it relies upon into four categories, each arguably showing a type of executive action that may establish constitutional arbitrariness that "shocks the conscience." These categories are: (1) actions based on improper motive; (2) sudden changes of a course of executive action; (3) false justifications for executive action; and (4) "singling out" a specific person or company. The Court addresses each in turn.

### 1. Improper Motive

Bullseye begins by citing *Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, for the proposition that an improper motivation alone may undercut a showing of a legitimate governmental interest sufficient to establish a violation of substantive due process. 307 F. Supp. 3d 1010, 1035 (E.D. Cal. 2018). In that case, which is currently on appeal, the district court denied a defendant's challenge to a jury verdict that found a violation of substantive due process. The district court held that proof of improper motivation alone was enough to support the jury's verdict. *Id.*

Crucially, though, the jury in *Hardesty* received substantial evidence that county officials acted with improper motive. As the court explained:

> Upon careful review, the trial record is replete with evidence that permitted the jury to conclude defendants ceased to recognize plaintiffs' vested right based on improper motivation, and not a legitimate governmental interest. For instance, the jury could reasonably have concluded this decision was based on an improper motivation in the form of political pressure from donors.

*Id*. at 1037. In contrast, Bullseye does not offer any specific factual allegations plausibly suggesting any improper governmental motive. Instead, Bullseye makes conclusory assertions,

such as that Defendants "used Bullseye as a scapegoat to conceal from the public DEQ's failure to establish any program to identify or control toxic waste emissions from small and medium size businesses." Bullseye did not allege any specific factual basis for this conclusion, in contrast to what the district court in *Hardesty* found supported the jury's verdict.

### 2. Sudden Change of Course

The *Hardesty* court relied on *Del Monte Dunes v. City of Monterey*, in which the Ninth Circuit reversed the dismissal of plaintiff's substantive due process claim and found that the case must be tried on the merits based on allegations that the defendants were "motivated [in rejecting a building plan], not by legitimate regulatory concerns, but by improper political pressure from neighbors and other residents of the city to preserve the property as open space." 920 F.2d 1496, 1508 (9th Cir. 1990). The Ninth Circuit in *Del Monte Dunes* also noted that

> the appellants' allegations, supported by affidavits, are that the city council had given approval to the 190–unit project, with 15 conditions that appellants substantially met and that the City's professional planning staff agreed they had substantially met; yet the same members of the city council *abruptly changed course* and rejected the plan, giving only broad conclusory reasons.

*Id.* (emphasis added).

*Del Monte Dunes* is distinguishable. In *Del Monte Dunes*, the government gave "only broad conclusory reasons" for its abrupt change of course. Bullseye, however, acknowledges that the governmental actors' initial motivation for regulating Bullseye was the preliminary results of the Moss Study. After receiving these results, a DEQ official contacted Bullseye and informed Bullseye that DEQ would be conducting air quality emissions testing by placing an air quality monitor close to Bullseye's facility. DEQ tested and measured the air quality over a period of 18 days in October and early November 2015. On January 19, 2016, DEQ received the test results. These results showed maximum daily concentrations of arsenic and cadmium above typical

urban concentrations, as defined by the federal Agency for Toxic Substances and Disease Registry. Although Bullseye contests the Moss Study and the reliability of the air quality testing results, neither Multnomah County nor the State Defendants gave only "broad and conclusory" reasons for any change of course. Instead, the factual allegations that Bullseye recites indicate that there were specific and non-conclusory reasons for the change of course, which occurred during a period of months, and that Defendants were apparently responding to a potentially serious public health hazard. In the context of this case, such a change of course, if that is what happened, is not conscience-shocking.

### 3. False Justification

The Ninth Circuit also has held that providing a false justification for a challenged governmental action may establish the requisite arbitrariness to support a substantive due process claim. In *Lockary v. Kayfetz*, the court held that a due process challenge to a moratorium on new water hookups raised a triable issue when the plaintiffs showed that the defendant city's proffered basis for the moratorium was untrue. 917 F.2d 1150, 1155-56 (9th Cir. 1990) (denying summary judgment). But *Lockary* also shows that Bullseye has not pleaded sufficient facts plausibly to allege that Defendants offered a false justification for their actions in this case.

In *Lockary*, the defendant city's stated reason for the moratorium on water hookups was that there was a water shortage. The court noted that "[a]lthough a water moratorium may be rationally related to a legitimate state interest in controlling a water shortage, the [plaintiffs] have raised triable issues of fact surrounding the very existence of a water shortage." *Id.* at 1156. The evidence included affidavits

> showing that following the imposition of the moratorium water
> consumption in Bolinas has increased by approximately 70%,
> water storage capacity has increased by approximately 1100%,
> BCPUD has provided water for secondary units and swimming
> pools, and BCPUD has voluntarily relinquished rights to certain

water sources. Additionally, an affidavit submitted by an engineer specializing in water management stated that BCPUD's leakage rate is at least double that of accepted norms and that BCPUD has sufficient water to permit population growth within the Bolinas area.

*Id.* at 1155-56. Thus, in *Lockary*, there were specific factual reasons to believe that there was a false justification given for the governmental action.

In contrast, Bullseye asserts that Defendants "unlawfully and deceitfully" invoked the Governor's Cease and Desist authority and that the Governor falsely asserted that Bullseye presented "an imminent and substantial endangerment to the health of persons." Such assertions, unlike those in *Lockary,* do not allege specific facts that indicate that the Defendants' justification was false. Therefore, the allegations that Bullseye presents do not state a facially plausible claim that Defendants' actions were supported by a false justification.

### 4. Singling Out a Specific Person or Company

Bullseye cites *Bateson v. Geisse* for the proposition that singling out "one individual to be treated discriminatorily" may also be a violation of substantive due process. 857 F.2d 1300, 1303 (9th Cir. 1988). In *Bateson*, the Ninth Circuit held that the plaintiff had met all of the requirements necessary for the city to issue him a building permit, but that the city council voted to withhold the permit without providing the plaintiff with any process. *Id.* In *Bateson*, however, the constitutional violation was not simply "singling out" a specific person or company for differential treatment but doing so in a fashion that was arbitrary or discriminatory. As discussed above, the facts alleged by Bullseye indicate that Defendants' actions were neither arbitrary nor discriminatory but instead were related to a perceived serious health risk.

### 5. Conclusion

The Court has reviewed Plaintiff's well-pleaded factual allegations, crediting them as true and finding all reasonable inferences in favor of Plaintiff. The Court also has disregarded

Plaintiff's legal conclusions couched as factual assertions. Applying relevant Supreme Court and Ninth Circuit precedent, the Court concludes that Plaintiff's well-pleaded factual allegations do not plausibly show conduct that "shocks the conscience." Accordingly, Bullseye has failed to state a claim for violation of its right to substantive due process actionable under § 1983.

## B. Regulation 6S

In Claim Two, Bullseye seeks a declaration that it is not subject to federal Regulation 6S,[6] as adopted by reference by Oregon into state law in Or. Admin. Reg. ("OAR") 340-244-0220(1).[7] Bullseye also seeks a declaration that Oregon's assertion of authority under Regulation 6S is unlawful. In addition, Bullseye requests appropriate injunctive relief. In their motion to dismiss Claim Two, the State Defendants argue that this Court lacks subject matter jurisdiction over that claim, the State Defendants have immunity under the Eleventh Amendment, and, based on the MAO the doctrine of claim preclusion (or *res judicata*) bars Bullseye's second claim. For the reasons that follow, the Court rejects these arguments.

---

[6] Regulation 6S provides, in relevant part: "You are subject to this subpart if you own or operate a glass manufacturing facility that is an area source of hazardous air pollutant (HAP) emissions and meets all of the criteria specified in paragraphs (a) through (c) of this section. . . . (c) Your glass manufacturing facility uses one or more continuous furnaces to produce glass that contains compounds of one or more glass manufacturing metal HAP, as defined in § 63.11459, as raw materials in a glass manufacturing batch formulation." The parties' disagreement largely turns on the meaning of the phrase "continuous furnaces."

[7] Oregon adopted by reference Regulation 6S in OAR 340-244-0220(1). That Oregon regulation provides, in relevant part: "**Emission Standards: Federal Regulations Adopted by Reference**. (1) Except as provided in sections (2) and (3) of this rule, 40 C.F.R. Part 61, Subparts A, C through F, J, L, N through P, V, Y, BB, and FF and *40 C.F.R. Part 63, Subparts* A, F through J, L through O, Q through U, W through Y, AA through EE, GG through YY, CCC through EEE, GGG through JJJ, LLL through RRR, TTT through VVV, XXX, AAAA, CCCC through KKKK, MMMM through YYYY, AAAAA through NNNNN, PPPPP through UUUUU, WWWWW, YYYYY, ZZZZZ, BBBBBB, DDDDDD through FFFFFF, *LLLLLL through TTTTTT*, VVVVVV through EEEEEEE, and HHHHHHH *are adopted by reference and incorporated herein*, and 40 C.F.R. Part 63, Subparts ZZZZ and JJJJJJ are by this reference adopted and incorporated herein only for sources required to have a Title V or ACDP permit. (Emphasis added.)

### 1. Subject Matter Jurisdiction

The State Defendants argue that the Court lacks subject matter jurisdiction to consider Bullseye's second claim because the administrative record shows that DEQ was acting at all relevant times solely under Oregon law. The State Defendants make a facial attack on the Court's subject matter jurisdiction based on the assertion that DEQ regulated Bullseye under state law and, thus, Bullseye's second claim is based entirely on state law and entitled to immunity under the Eleventh Amendment.[8] The State Defendants note that the relevant portion of the federal air pollution laws and regulations, including the NESHAPs, may be administered by a state under delegation and that state delegation to enforce the NESHAPs require that the state has state law authority to enforce the air pollution laws, to request information from regulated sources and to inspect sources and their records, among other authorities. *See generally* 42 C.F.R. § 63.91(d)(3)(i).

The analysis of this issue is nuanced. The State Defendants argue that their authority to regulate Bullseye was DEQ's own rule, OAR 340-244-0220(1), which incorporated by reference federal Regulation 6S. In DEQ's letter to Bullseye dated April 13, 2016, DEQ stated that it had "requested clarification and interpretation from EPA on the applicability of [Regulation 6S]" and that "[*b*]*ased on EPA's clarification* and other information about Bullseye's operations, DEQ has

---

[8] Although a state generally has immunity from suit in federal court under the Eleventh Amendment, the United State Supreme Court has recognized several exceptions to Eleventh Amendment immunity. One exception, recognized in *Ex parte Young*, 209 U.S. 123 (1908), provides that federal courts may grant prospective relief to enjoin individual agents of state governments from engaging in unlawful conduct. This exception includes suits for declaratory relief under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. *Steffel v. Thompson*, 415 U.S. 452, 475 (1974); *see also Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 646-48 (2002) (allowing prospective injunctive and declaratory relief in the context of state regulatory action); *National Audubon Society Inc. v. Davis*, 307 F.3d 835, 847-848 (9th Cir. 2002). Thus, the Eleventh Amendment does not preclude Bullseye's Claim Two.

revised its previous interpretation and has determined that [Regulation 6S] applies to Bullseye." ECF 8, Ex. 3 (emphasis added). DEQ's letter also discusses relevant definitions within Regulation 6S and the applicability of that federal regulation to the furnaces used by Bullseye at its facility. The letter concludes by citing an Oregon Administrative Rule that allows DEQ to request information for the purpose of fulfilling its regulatory responsibilities.

On April 25, 2016, DEQ again wrote to Bullseye in a "Pre-Enforcement Notice." ECF 8, Ex. 5. In this notice, DEQ specifically discussed the "applicability criteria" contained in Regulation 6S and stated that "*[b]ecause your facility is subject to Subpart 6S*, your facility was required to apply for a Title V permit." (Emphasis added.) Thus, DEQ's state enforcement action, in DEQ's own words, depended on DEQ's interpretation of a *federal rule*. In other words, it was "because" of the applicability of the federal regulation (Regulation 6S) that DEQ determined that it had the authority to regulate. Thus, the Court concludes that there is a dispute over the meaning and applicability of a *federal regulation* and this dispute provides subject matter jurisdiction over Bullseye's request for declaratory and injunctive relief regarding Regulation 6S.

Further, even if the state regulation that followed DEQ's interpretation of Regulation 6S makes the federal nature of this dispute less apparent, the Court finds that it would have "arising under" jurisdiction based on *Grable & Sons Metal Prods., Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 313-314 (2005). In *Grable*, the Supreme Court held that a case may "arise under" federal law when a state-law claim contains a federal issue that is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance. *Id.* Each of these four conditions are present here. The proper interpretation of Regulation 6S is necessarily raised and is actually

disputed in this case, based on the DEQ's own statements and documents. The issue also is substantial; indeed, it is at the crux of the parties' dispute in Claim Two. Finally, because the State Defendants relied upon and accepted a federal agency's (*i.e.*, EPA's) interpretation of Regulation 6S, resolution of this dispute by a federal court will not disrupt any federal-state balance.

### 2. Claim Preclusion

The State Defendants also argue that because Bullseye's second claim presents the same set of facts and law that were "expressly and finally resolved by the MAO," that claim is subject to claim preclusion, also known as "*res judicata*." When litigants ask a federal court exercising federal question jurisdiction to give preclusive effect to a state judgment, the federal court must apply "the *res judicata* principles of the law of the state whose decision" would bar further litigation. *Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1308 (11th Cir. 2006); *see also Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (noting that "[t]he preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, which . . . . commands a federal court to accept the rules chosen by the State from which the judgment is taken").

Claim preclusion "generally prohibits a party from relitigating the same claim or splitting a claim into multiple actions against the same opponent." *Bloomfield v. Weakland*, 339 Or. 504, 510 (2005). The Oregon Supreme Court explains claim preclusion as follows:

> [A] plaintiff who has prosecuted one action against a defendant through to a final judgment binding on the parties is barred on *res judicata* grounds from prosecuting another action against the same defendant where the claim in the second action is one which is based on the same factual transaction that was at issue in the first, seeks a remedy additional or alternative to the one sought earlier, and is of such a nature as could have been joined in the first action.

*Id.* at 510-11. Thus, a party is foreclosed from litigating the same claim "on any ground or theory

of relief that the party could have litigated in the first instance." *Id.* at 511. "Claim preclusion

applies equally to a defendant's defense." *B & K Livestock v Auction, Inc. v. Oregon Dept. Envtl.*

*Quality*, 2013 WL 3973880 (D. Or. July 31, 2013). Claim preclusion also may apply to

administrative proceedings. *Drews v. EBI Companies*, 310 Or. 134, 142 (1990) ("Both issue

preclusion and claim preclusion apply to administrative proceedings, provided that the tribunal's

decision-making processes include certain requisite characteristics.").

The question before the Court is whether the MAO between Bullseye and DEQ precludes

Bulleye's second claim. As the Oregon Supreme Court recently clarified, whether claim

preclusion applies to a consent decree "turns on the intent of the parties." *In re Bertoni*, 363

Or. 614, 629 (2018) ("when a stipulated judgment or consent decree is based on an underlying

settlement, as it is in this case, the question whether claim preclusion applies turns on the intent

of the parties in settling the first action").

The MAO outlined the parties' differing views about the applicability to Bullseye of

Regulation 6S. It also described the parties' desire to resolve both past and future violations. The

MAO states in relevant part:

> 14.     Based upon EPA's April 12, 2016 letter and other
> information that Bullseye has provided to DEQ, *DEQ has*
> *concluded that Bullseye is now subject to 6S* and will be operating
> in violation of 6S and OAR 340-244-0220(1) until Bullseye fully
> complies with the compliance schedule in paragraph 26 of this
> MAO and is issued an Oregon Title V Operating Permit in
> accordance with paragraph 26. *Bullseye disagrees with DEQ's*
> *conclusion that it is and will be operating in violation of*
> *Regulation 6S* and OAR 340-244- 0220(1).
>
> 15.     DEQ and Bullseye recognize that the Environmental
> Quality Commission has the power to impose civil penalties and to
> issue an abatement order for violations of Oregon environmental
> law. Bullseye does not agree with DEQ's conclusion that Bullseye
> has violated 6S and Bullseye makes no admission of any such

> violation. *With these caveats, Bullseye nevertheless voluntarily agrees to enter into this MAO in settlement of any past or future violations referred to in paragraphs 8 through 14 above.* Therefore, pursuant to ORS 83.417(3)(a) and (b), *DEQ and Bullseye agree to settle the violations that may have occurred prior to the date of this agreement, and to limit and resolve future violations referred to in paragraph 14 above, in advance, by this MAO.*

ECF 8-1, ¶¶ 14-15 (emphasis added).

There is no dispute that the MAO resolved the past alleged violations. There also is no dispute that provided Bullseye complies with the terms of the MAO, that compliance will ensure no additional violations in the future, at least with respect to the issues covered by the MAO. Nothing in the MAO, however, expressly restricted Bullseye from seeking declaratory or injunctive relief to resolve the parties' dispute about the interpretation and reach of Regulation 6S. In the MAO, both parties agreed to disagree whether Regulation 6S applies to Bullseye's operations, although Bullseye expressly promised to comply with that regulation unless and until there was a ruling by an appropriate court that it did not apply.

The State Defendants argue: "The consequence of the 6S Rules not applying to Bullseye is that Bullseye may be freed from its MAO obligation to obtain a Title V permit, rendering that provision of the MAO a nullity." ECF 41, at 2. The State Defendants overstate the consequences of a ruling rejecting their claim preclusion argument. Unless and until there is a contrary interpretation of Regulation 6S by an appropriate court (and likely one that is sustained on appeal), Bullseye must obtain and maintain a Title V permit and comply with all other obligations stated in the MAO. According to Bullseye, it has obtained (or filed for) a Title V permit, complied with all other obligations in the MAO, and intends to continue to do so unless and until an appropriate court determines that Regulation 6S does not apply to Bullseye's operations. That is a significant accomplishment for the State Defendants. The MAO satisfies the

State Defendants' immediate and continuing regulatory and public health concerns and needs, while also allowing Bullseye to reserve its position that Regulation 6S does not apply to it or its operations. Thus, under the MAO, the parties saved for another day the final resolution of their legal dispute involving regulatory interpretation and application. Based on Bullseye's Complaint, that day has come. Bullseye's Second Claim may proceed to a resolution on the merits.

## CONCLUSION

The Court ADOPTS IN PART and DECLINES TO ADOPT IN PART the F&R (ECF 27). Regarding Claim One, the Court GRANTS Multnomah County Health Department's Motion to Dismiss (ECF 6) and GRANTS IN PART the State Defendants' Motion to Dismiss (ECF 7). Regarding Claim Two, the Court DENIES IN PART the State Defendants' Motion to Dismiss (ECF 7). The Court dismisses without prejudice Bullseye's first claim to the extent that Bullseye alleges a violation of 42 U.S.C. § 1983. The Court, however, dismisses with prejudice Bullseye's first claim to the extent that Bullseye alleges a violation of 42 U.S.C. § 1985. The Court does not dismiss Bullseye's second claim. Further, the Court GRANTS all pending requests for judicial notice (ECF 8, ECF 16, and ECF 19).

**IT IS SO ORDERED**.

DATED this 2nd day of January, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge